**WO**                                                                      JL

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Richard Johnson, | No. CV-21-00559-PHX-MTL (ESW) |
| Plaintiff, | |
| v. | **ORDER** |
| Thomas Higginson, et al., | |
| Defendants. | |

Plaintiff Richard Johnson, who is currently confined in the Arizona State Prison Complex-Eyman, brought this civil rights action pursuant to 42 U.S.C. § 1983. Defendants Major Chris O'Connor and Deputy Wardens Thomas Higginson and Shannon Thielman move for summary judgment on the merits of Plaintiff's Fourteenth Amendment due process claims relating to his validation as a member of a Security Threat Group (STG). (Doc. 108.) Plaintiff was informed of his rights and obligations to respond pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) (Doc. 111), and he opposes the Motion. (Doc. 116.) Defendants filed a Reply. (Doc. 120.)

The Court will grant the Motion for Summary Judgment.

**I.     Background**

As relevant here, in Count Two of the First Amended Complaint, Plaintiff alleges that Defendants Higginson, Thielman, and O'Connor violated his Fourteenth Amendment right to due process in connection with his STG validation. (Doc. 9.) In Count Three, Plaintiff again asserts that the STG validation process violated his right to due process

because he did not receive an "impartial hearing," he was validated based on documents that "lacked a sufficient indic[i]a of reliability," and he was denied "the opportunity to be heard at a meaningful time and in a meaningful manner." (*Id.*) Plaintiff further claims that Defendants Higginson, Thielman, and O'Connor violated his Fourteenth Amendment right to due process with respect to his conditions of confinement. (*Id.*)

On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated due process claims in Counts Two and Three against Defendants O'Connor, Higginson, and Thielman and directed them to answer the claims. (Doc. 10.) The Court dismissed Count One and Defendant Brass. (*Id.*)

**II.     Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial."

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

**III. Facts**

**A. Security Threat Groups**

Arizona Department of Correction, Rehabilitation and Reentry (ADC) Department Order 806 governs Security Threat Groups.[1] (Doc. 109-1.) A STG is defined as "[a] club, association, organization, or gang" meeting the requirements of a Criminal Street Gang pursuant to A.R.S. § 13-105 or possessing "the unique resources, training, skills, intent . . . to threaten the safe and secure operation of the Department." (*Id.* at 4.) ADC's Special Security Unit (SSU) monitors and gathers evidence about prisoners suspected of being members of a STG. (*Id.* at 5-7.) If enough evidence is collected to confirm a prisoner is a STG member, SSU prepares a Validation Packet. (*Id.* at 7-8.) Validation Packets are then presented to the STG Validation Hearing Committee (VHC), and a hearing is held. (*Id.* at 9.) Suspected prisoners are given notice of the hearing, are present throughout the hearing, and are able to present a defense, unless they refuse to attend or their behavior is disruptive. (*Id.* at 9-12.) The VHC then determines whether the evidence supports validation as an active STG member. (*Id.* at 12.)

The ADC criteria for STG validation fall into fourteen 14 categories, labeled A through N. Each category is given a points value; prisoners with 2 points are considered

---

[1] In his Statement of Facts, Plaintiff asserts that the version of DO 806 that Defendants submitted with their Motion is not the same version of DO 806 that prisoners receive. (Pl.'s Statement of Facts, Doc. 117 at 1¶ 1.)

STG suspects, and prisoners with ten 10 or more points in at least 2 categories can be validated by the VHC.

Validated STG members who refuse to renounce and debrief are assigned to maximum custody at ASPC-Eyman, Browning Unit. (Doc. 109-1 at 17.) To become eligible for reduced custody status, the prisoner can renounce and debrief, or complete the STG Step-Down Program. (*Id.* at 17-18.)

### B.     Plaintiff's STG Validation

Plaintiff was originally suspected of STG membership in May 2010 when his name was included on an STG "hit list" directed at members of the STG Warrior Society. (Decl. of Levi Brass, Doc. 109-2 at 3 ¶ 8; Doc. 109-2 at 6.) Plaintiff was also believed to be connected to the murder of an STG suspect in June 2010. (Brass Decl. ¶ 9.) On June 5, 2014, Plaintiff was transferred to Kasson Unit detention to begin the STG validation process. (*Id.* 15.)

On July 28, 2014, Sergeant Brass interviewed Plaintiff about his affiliation with the STG Warrior Society, using the STG Identifying Questionnaire. (*Id.* ¶ 19; Doc. 109-3 at 6-8.) Plaintiff refused to answer any questions. (Doc. 109-3 at 6-8.) Prior to Plaintiff's 2014 Validation Hearing, he was already a level 5 (maximum custody, highest risk) prisoner, and he had "more than enough points" under the STG Validation Criteria to be validated by the STG Validation Hearing Committee. (Brass Decl. ¶ 20.) In October 2014, Plaintiff was validated as an STG member.

After Plaintiff filed a civil rights Complaint in this Court relating to his STG Validation,[2] Plaintiff agreed to a new STG Validation Hearing with stipulations that the hearing be video recorded, that Plaintiff be permitted to introduce discovery documents on his behalf, and that the Validation Packet would be the same one used to validate him in October 2014. (Pl.'s Statement of Facts (PSOF), Doc. 117 at 7 ¶ 37; Doc. 117 at 76-78.) On March 12, 2020, the Validation Hearing was conducted. (Doc. 109-3.) After reviewing

---

[2] *See Johnson v. McWilliams*, CV-15-00670-PHX-GMS (D. Ariz. 2015).

- 4 -

Plaintiff's validation packet, the VHC found sufficient evidence to confirm Plaintiff as a member of the Warrior Society. (*Id.* at 3-49.)

On March 18, 2020, Plaintiff appealed to the STG Appeals Committee. (*Id.* at 50-52.) On March 30, 2020, the Committee denied his appeal. (*Id.* at 53-56.)

Subsequently, Plaintiff's counsel and the Arizona Attorney General agreed that Plaintiff would be offered another STG Validation Hearing with different committee members. (PSOF ¶ 39; Doc. 117 at 80.) Like the March 12, 2020 hearing, the new hearing was to be video recorded, and the October 2014 Validation Packet would be used. (Doc. 117 at 80.) The Validation Packet included the following evidence, which was the same evidence that supported Plaintiff's 2014 STG validation. First, on June 5, 2014, SSU found a list of prisoner names, ADC numbers, monikers, and housing locations in Plaintiff's property. (*Id.*; Doc. 109-4 at 15.) On June 10, 2014, Sergeant Brass documented the "roll call" he had found in Plaintiff's property box. (Doc. 109-4 at 15.) Following an investigation, SSU determined the list was a "roll call" pertaining to Native American STGs. (*Id.*) The list included every building at Central Unit Main yard and would have been "held for political reasons," that is, to "know all of the inmates around in good standing[] at all times." (*Id.*) SSU noted that the list "would eventually be sent to Browning Unit to further Warrior Society knowledge of the Native American inmate population" at Central Unit. (*Id.*) The list was assigned to Category D (Documentation)[3] and was worth 5 points towards validation. (*Id.* at 53.)

Second, on June 26, 2014, SSU found a "micro note" in another suspected Warrior Society's cell, discussing Warrior Society business, specifically, "a debt to be collected." (*Id.* at 25.) After an investigation, on July 1, 2014, SSU determined Plaintiff wrote the micro note. (*Id.* at 25-31.) The micro note was assigned to Category F (Authorship) and was worth 7 points toward validation. (*Id.* at 54.) Third, on August 1, 2014, SSU

---

[3] According to the STG Worksheet for Plaintiff's validation, Category D includes STG-specific by-laws, ceremonial procedures, rosters, hit lists, address book entries, and similar non-publication items. (Doc. 109-3 at 12.)

- 5 -

intercepted an outgoing letter authored by Plaintiff discussing Warrior Society members and their validation status. (*Id.* at 33.) SSU determined the letter was intended to be piggybacked (forwarded to an unaddressed recipient) to a validated Warrior Society member. (*Id.* at 33-37.) This letter was assigned to Category F (Authorship) and was worth 7 points toward validation.[4] (*Id.* at 54.)

Fourth, on June 9, 2014, SSU found a letter in Plaintiff's property box that was authored by a Warrior Society member. (*Id.* at 40.) The letter "discusse[d] business as it pertains to the Warrior Society" and mentioned other Warrior Society associates/members. (*Id.* at 40-44.) The letter was assigned Category I (Association) and was worth 2 points toward validation. (*Id.* at 54.)

Fifth, on June 9, 2014, SSU found a letter in Plaintiff's property box that was authored by a high-ranking member of the Warrior Society. (*Id.* at 46.) The letter did not discuss "business as it pertains to the Warrior Society," but the author introduced himself to Plaintiff and mentioned remembering Plaintiff from the past. (*Id.*) The author also signed the letter with his moniker. (*Id.*) This letter was assigned to Category J (Contacts)[5] and was worth 2 points toward validation. (*Id.* at 46-49.)

On September 30, 2020, the STG Validation Hearing was conducted. (*Id.* at 2.) Plaintiff was notified about the hearing on September 15, 2020. (*Id.* at 50-51.) The VHC consisted of Defendants Higginson, Chris O'Connor, and Thielman. (*Id.* at 53.) None of them had sat on Plaintiff's prior VHCs.

At the hearing, Defendants read the statement of charges to Plaintiff and showed him the evidence that supported his validation. (Doc. 116 at 4.) Plaintiff presented a 52-page PowerPoint and "specifically addressed" the evidence Defendants cited. (*Id.*; Doc.

---

[4] Category F includes STG-specific documents/articles or actual "gang business" correspondence written by the suspected prisoner. (Doc. 109-3 at 12.)

[5] Category J includes correspondence, financial transactions, or visits from known relatives and close associates/suspects of validated STG members. (Doc. 109-3 at 13.)

109-6.) Plaintiff also "specifically addressed Defendant Thielman about her involvement in a previous STG hearing."[6] (Doc. 116 at 5.)

After Plaintiff's presentation, he was removed from the room and then brought back for the results of the hearing. (*Id.*) Defendant Higginson read from a pre-prepared written statement that "the committee has determined that the evidence [and] testimony which has been presented is reliable and it is the decision of this committee to validate you as a member of . . . a Security Threat Group, for the following reasons: Category D – Documents, 5 points[;] Category F – Authorship, 7 points[;] and Category J – Contacts, 2 points[,] for a total of 14 points." (*Id.* at 6-7.) Defendants provided no other comments or statements regarding the reasons for Plaintiff's validation.

Plaintiff appealed the findings on October 6, 2020. (*Id.* at 55-56.) The STG Appeals Committee, which did not include Defendants O'Connor, Higginson, and Thielman, denied the appeal on November 3, 2020. (*Id.* at 57-60.)

**IV.  Discussion**

    **A.  STG Validation Hearing**

        **1.  Legal Standard**

The Due Process Clause of the Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. In order to analyze a procedural due process claim, the Court engages in a two-step analysis: First, the Court must determine whether the prisoner was deprived of a constitutionally protected liberty or property interest. *Johnson v. Ryan*, 55 F.4th 1167, 1179 (9th Cir. 2022). Second, the Court must examine whether that deprivation was accompanied by sufficient procedural protections. *Id.* (citing *United States v. 101 Houseco, LLC*, 22 F.4th 843, 851 (9th Cir. 2022)). To determine whether the procedural protections provided are sufficient at the second step, the Court looks to (1) the private

---

[6] Plaintiff is referring to his removal from the STG Step-Down Program in February 2018. Defendant Thielman was one of the committee members who conducted the STG Step-Down Revocation Hearing and revoked Plaintiff's participation in the Step-Down Program. As a result, Plaintiff was returned to maximum custody.

interest affected; (2) the risk of an erroneous deprivation and the probable value of any additional or substitute procedural safeguards; and (3) the government's interest. *Id.* at 1179-80 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

For the initial decision to place a prisoner in maximum custody, due process is generally satisfied by notice of the factual basis for the placement and an opportunity to be heard, as these procedural mechanisms serve to avoid the risk of erroneous deprivation. *See Wilkinson v. Austin*, 545 U.S. 209, 226 (2005). The Supreme Court indicated that notice is adequate if prison officials disclose "the factual basis" of their allegations against the inmate before placing him in a supermax facility. *Wilkinson*, 545 U.S. at 224-326; 459 U.S. 406, 476 (1983), *overruled in part on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995). In examining the record, the Court must not make its own assessment of the credibility of witnesses or reweigh the evidence, but the evidence must have "some indicia of reliability." *Cato v. Rushen*, 824 F.2d 703, 705 (9th Cir. 1987). The Ninth Circuit has recognized that "as long as 'some evidence' supports the factual determination made by prison officials, there was no violation of due process." *Castro*, 712 F.3d at 1307. The Ninth Circuit noted the "low hurdle" set by the "some evidence" standard. *Id.* at 1314-15.

**2.     Analysis**

The evidence demonstrates that Plaintiff's September 30, 2020 Validation Hearing met the requirements of due process. Plaintiff received advance notice of the hearing, was present, challenged the evidence that was used to validate him, presented evidence in his defense, received written findings describing the evidence used to validate him as an STG member, appealed the findings, and received a written decision with respect to his appeal.

In his Response to Defendants' Motion for Summary Judgment, Plaintiff argues that the September 30, 2020 Validation Hearing did not constitute a fair opportunity to be heard in a meaningful manner. (Doc. 116 at 10.) Plaintiff contends that he provided Defendants "uncontroverted documents that [Sergeant Brass] was not telling the truth about [the] evidence that was being used to validate [Plaintiff]," but Defendants "consciously chose to ignore" the documents that Plaintiff had presented. (*Id.* at 7, 10.) Specifically, Plaintiff

asserts that he presented a response from the Division Director of Offender Operations, Carson McWilliams, which stated, "'[t]here is no evidence of any paperwork being seized'" from Plaintiff's property "at exactly the same timeframe" that Sergeant Brass stated he found evidence of STG activity in Plaintiff's property. (*Id.*)

Plaintiff is referring to a July 30, 2014 Inmate Letter Response from Carson McWilliams. On July 13, 14, and 21, 2014, Plaintiff sent Inmate Letters to former ADC Director Charles Ryan, stating that he had not received a response to a grievance that he had submitted while he was at ASPC-Eyman and that copies of grievances were missing or seized from his property box. (Doc. 117 at 72.) On July 30, 2014, McWilliams responded to the Inmate Letters. (*Id.*) McWilliams wrote that the Central Unit Property office had one box of contraband property belonging to Plaintiff, but the box contained only express property and contraband items. (*Id.*) McWilliams wrote that there was "no evidence of any paperwork being 'seized.'" (*Id.*)

Plaintiff asserts that McWilliam's response "give[s] credibility" to Plaintiff's claim that he "never possessed STG documents" and shows that prison officials "acknowledge[d] this fact." (Doc. 116 at 10-11.) But Plaintiff complained about copies of grievances that he claimed were missing or seized from his property box. McWilliams's response stated only that the box containing contraband property belonging to Plaintiff did not contain any grievances. Thus, McWilliams's response does not support Plaintiff's assertion that officials acknowledged that he never possessed STG documents.

Next, Plaintiff points to Sergeant Brass's written statements "about the purported evidence," which Plaintiff argues contradicts the information in the Validation Packet. (*Id.* at 11.) Plaintiff asserts that when Sergeant Brass was asked what information Brass had on or before June 5, 2014 that prompted Brass to move Plaintiff to detention for validation, Brass responded, "You had already accrued more than half the points to be validated." (*Id.*) Plaintiff contends the Validation Packet contradicts Sergeant Brass's response because the Validation Packet does not include any evidence of STG activity before June 9, 2014, which was four days after Plaintiff was moved to detention. (*Id.*)

Plaintiff also argues that when Sergeant Brass was asked why Plaintiff was moved to detention for validation before he was a suspect, Brass responded, "You were already a suspect." (*Id.*) Plaintiff asserts that the Validation Packet contradicts Brass's response because the validation criteria state that a prisoner must accrue 2 points to be considered a suspect, and Plaintiff "had no points in his validation packet." (*Id.*)

Plaintiff further contends that when Sergeant Brass was asked why Plaintiff was moved to detention before any evidence was acquired, Brass responded, "The evidence was already acquired." (*Id.*) Plaintiff argues that the Validation Packet contradicts Brass's response because there was no evidence in Plaintiff's Validation Packet from before June 5, 2014. (*Id.* at 12.)

Third, Plaintiff argues that the May 20, 2010 "hit-list," which, according to Plaintiff, Defendants "are claiming was the real reason why Plaintiff was transfer[r]ed to detention for validation before any evidence was acquired," was not in his 2014 Validation Packet. (*Id.*) Plaintiff contends that Defendants presented the "hit-list" for the first time in their Motion for Summary Judgment. (*Id.* at 13.) Plaintiff asserts that before the September 30, 2020 Validation Hearing, his appointed counsel requested "[a]ll documents that refer or relate to Plaintiff's transfer on or about June 05, 2014, from Central Unit to Kasson Unit-Detention," and Defendants did not even "refer[] to" the "hit list" in their response to the document request. (*Id.*) Plaintiff contends the "hit-list" and other purported evidence of STG activity has been "litigated before," and "[c]ourts have ruled 'its concern about the unreliability' of '[e]vidence concerning . . . [Plaintiff].'"[7] (*Id.* at 12.)

---

[7] Plaintiff is referring to his criminal proceeding in Arizona Superior Court case #CR2011-005346. There, Plaintiff pleaded guilty to solicitation of second-degree murder. In his Response to Defendants' Motion for Summary Judgment, Plaintiff cites a portion of an August 13, 2012 trial minute entry. (Doc. 116 at 12.) Plaintiff never went to trial in that case; Plaintiff's co-defendant was found guilty by a jury of second-degree murder and promotion of prison contraband. Thus, the minute entry from which Plaintiff quotes was not part of *Plaintiff's* criminal conviction. Moreover, the portion of the minute entry that Plaintiff quotes does not support his assertion. The minute entry states,

> The Court has received and reviewed the State's motion to Reconsider

Defendants do not dispute that the "hit list" was not included in the Validation Packet and assert that the "hit list" was irrelevant to his September 2020 validation. (Doc. 120 at 2.) Defendants contend that they included the "hit list" only to rebut Plaintiff's contention that his transfer to detention pending validation was pretextual because there was no evidence of STG activity at the time of his transfer. (*Id.*) Moreover, as Defendants

---

> Admission of Rule 404(B) Evidence concerning Defendant Johnson. The Court has previously noted its concern about the unreliability of the bases for the State's proffered *opinion testimony*. Because the proffered evidence does not satisfy Rule 702(b)'s requirement that expert testimony be "based on sufficient facts or data," the State has failed to demonstrate by clear and convincing evidence that Johnson is a member of or affiliated with the Warrior Society.

*See* https://courtminutes.maricopa.gov/viewerME.asp?fn=Criminal/082012/m5376039.pdf (last accessed Dec. 19, 2023) (emphasis added).

Plaintiff also cites another of his cases in this Court, *Johnson v. Juvera*, CV-12-00539-PHX-GMS (D. Ariz. 2012). In that case, Plaintiff alleged that ADC officers were deliberately indifferent to a substantial risk of harm to Plaintiff "evidenced by (1) the yard consisting of two groups of Native Americans who were known to be different Security Threat Groups (STGs) hostile to each other and housed in separate buildings and (2) instructions from supervisors to keep the two groups separate from one another due to security concerns." (Doc. 161 in CV-12-00539.) Plaintiff claimed that as a result, he was attacked by another prisoner and suffered injuries. (*Id.*) As noted, Plaintiff pleaded guilty in Superior Court to solicitation of second-degree murder in connection with the attack, during which the prisoner who allegedly attacked Plaintiff was killed.

In the Court's October 22, 2013 Order granting Defendants' Motion for Summary Judgment, the Court noted, "the record shows that Plaintiff was not an STG member or a member of any particular group of prisoners who might be susceptible to attack," and therefore, "there was no obvious reason Plaintiff needed to be separated from [another prisoner] for eating, recreation, or housing and no reason Defendants would have anticipated that Plaintiff was subject to an excessive risk by being exposed to [the other prisoner]." (Doc. 161 in 12-CV-00539.) At the time the Court granted Defendants' Motion for Summary Judgment, Plaintiff had not been validated as an STG member, which did not occur until October 2014. Thus, the reliability of the evidence used to support Plaintiff's STG validation was not at issue in 12-CV-00539. Plaintiff's assertion that the evidence has been "litigated before" and that "[c]ourts have ruled 'its concern about the unreliability'" of the evidence is disingenuous.

- 11 -

point out, they were not involved in the decision to transfer Plaintiff to detention pending validation. (*Id.* at 3.)

Next, Plaintiff argues that the Validation Packet did not include "some evidence with an indicia of reliability." (Doc. 116 at 13.) He denies possessing the "roll call" list that SSU determined pertained to Native American STGs; disputes that the "micro note" found on June 26, 2014, and the letter SSU found on August 1, 2014, related to "gang business"[8]; and denies that he possessed either of the letters that were authored by members of the Warrior Society. (*Id.* at 13-16.) He contends the evidence of Sergeant Brass's "proclivity of being disingenuous" creates a genuine dispute of material fact regarding whether there was "some evidence" with "some indicia of reliability" to validate him. (*Id.* at 17.)

Plaintiff further contends that Defendant Higginson read from a pre-prepared written statement when Higginson informed Plaintiff of the results of the Validation Hearing. (*Id.* at 18.) Plaintiff asserts that he requested the written statement and "other documents pertaining to" the September 30, 2020 Validation Hearing, but Defendants responded that the documents do not exist. (*Id.*) Plaintiff contends that a "pre-determined decision combined with an explanation for the specific reasons[] that was substituted with written criteria[] does not provide a fair opportunity to meaningfully challenge [his] validation." (*Id.*)

This Court cannot assess Sergeant Brass's credibility or reweigh the evidence presented to validate Plaintiff as an STG member. In their discovery responses, each named Defendant stated, "insofar as Plaintiff is asking if I believe Officer Brass fabricated information or evidence related to the STG Validation Hearing on September 30, 2020, . . . . I have no reason to believe that." (*See* Doc. 109-7.) Plaintiff has not pointed to any evidence in the record that contradicts Defendants' statements.

Moreover, although Plaintiff disputes the significance of some of the evidence used to validate him and denies possessing other evidence, that does not demonstrate that there

---

[8] The Validation Hearing Committee did not rely on the Category I document to validate Plaintiff.

- 12 -

was not "some evidence" to support Plaintiff's validation. Plaintiff also has not shown the evidence used to validate him did not have "some indicia of reliability." And even if Defendant Higginson read from a pre-prepared written statement, that does not mean there was not "some evidence" with "some indicia of reliability" to support his validation. Because there was "some evidence" to support his validation, and the evidence had "some indicia of reliability," there was no due process violation with respect to the September 30, 2020 Validation Hearing.

Finally, Plaintiff argues that the Validation Appeal did not afford him a fair opportunity to meaningfully challenge his validation. (*Id.* at 17.) He asserts that he was only given verbal reasons for his validation at the Validation Hearing, and Defendants' "explanation" was not sufficient to allow him to meaningfully challenge his validation. (*Id.*) The evidence demonstrates that in denying Plaintiff's Validation Appeal, the STG Appeals Committee set forth Plaintiff's assertions regarding the credibility of the evidence used to validate him and stated that, "[u]pon review," the Committee found the points assessed for each Category were valid. (Doc. 109-4 at 57-60.) The evidence shows that Plaintiff had an opportunity to meaningfully challenge his validation. Due process does not require that the written denial of a validation appeal include specific reasons for rejecting Plaintiff's assertions.

For the foregoing reasons, the Court will grant Defendants' Motion for Summary Judgment as to Plaintiff's due process claim with respect to his Validation Hearing.

### B.     Conditions in Maximum Custody

"A liberty interest 'may arise from the Constitution itself . . . or it may arise from an expectation or interest created by state laws or policies.'" *Johnson*, 55 F.4th at 1180 (quoting *Wilkinson*, 545 U.S. at 221). "The Constitution does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement, but such an interest may 'arise from state policies or regulations.'" *Id.* (quoting *Wilkinson*, 545 U.S. at 221–22; *Meachum v. Fano*, 427 U.S. 215, 225 (1976) ("[T]he Due Process Clause [does not] ... protect a duly convicted prisoner against transfer from one institution to another within the

state prison system. Confinement in any of the State's institutions is within the normal limits or range of custody.")). However, an interest in avoiding certain conditions of confinement "will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472 (1995) (citations omitted).

Because the Court concludes Plaintiff received all the process he was due with respect to the September 30, 2020 Validation Hearing, Plaintiff did not have an attendant right to be free from the conditions of confinement in maximum custody. Thus, the Court will grant Defendants' Motion for Summary Judgment as to Plaintiff's claim regarding the conditions of confinement in maximum custody.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 108).

(2) Defendants' Motion for Summary Judgment (Doc. 108) is **granted**, and the action is terminated with prejudice. The Clerk of Court must enter judgment accordingly and close this case.

Dated this 20th day of December, 2023.

Michael T. Liburdi
United States District Judge